**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Janelle Atkinson-Wignall,<br><br>    Plaintiff,<br><br>v.<br><br>STATE UNIVERSITY OF NEW YORK,<br><br>    Defendant. | **THIRD AMENDED**<br>**COMPLAINT AND JURY DEMAND**<br><br><br>Case No. 2:19-cv-6527 |

     **COMES NOW** the Plaintiff, Janelle Atkinson-Wignall, by and through her attorneys, and for her cause of action hereby states the following:

**INTRODUCTION**

     1.     Plaintiff Janelle Atkinson-Wignall (hereinafter "Plaintiff" or "Coach Atkinson") brings this action against the State University of New York (hereinafter "Defendant" or "SUNY"), for damages, equitable and other relief, for gender discrimination and race discrimination in her employment in violation of her rights under federal law.

     2.     This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. (hereinafter "Title VII") and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (1982) (hereinafter "Title IX").

     3.     Title VII protects employees from gender-based and race-based discrimination in the terms and conditions of their employment.

     4.     Title IX prohibits sex discrimination in education and related activities, and it applies to claims of sex discrimination in certain employment, including coaches, administrators, and academics. 20 U.S.C. § 161; 34 C.F.R. part 106, Subpart E.

**Risks of Gender Stereotypes**

5. Female coaches at institutions across the nation are at a high risk of gender bias adversely affecting the terms and conditions of employment.

6. Female coaches of color are at an even higher risk of gender bias.

7. A female coach is judged differently and more harshly by her student athletes and their parents.

8. A female is expected to behave in a manner that is consistent with societal stereotypes about females. If she behaves in a stereotypically feminine manner, then she is blamed for being too soft as a coach. If she behaves the way we expect coaches to behave, then she is blamed for being too harsh. The double standards result in student-athlete complaints that are the direct result of gender bias. A university that relies, in whole or in part, upon complaints generated by bias or stereotypes is liable for gender discrimination.

9. Racial stereotypes exacerbate the risk to female coaches of color. A female coach of color who behaves the way we expect coaches to behave is even further misperceived, due to racial stereotypes, as being too harsh.

10. Universities also react and respond differently to student athletes based on their gender. They coddle and patronize female athletes, while ignoring or overlooking male athletes who raise complaints about legitimate concerns. This result is discriminatory based on gender and harms both male and female student athletes.

11. The result of these double standards put male athletes at risk (because their complaints are ignored) and place female coaches at risk (because they receive more complaints and are held to a higher standard).

12. Any of these biases and stereotypes—relying on biased student-athlete complaints against coaches, treating the complaints of female athletes differently than those by male athletes,

or holding female coaches to double standards—are all forms of gender discrimination that violate the purpose and scope of Title VII.

**Segregation of Women's Sports/Leadership Roles as Evidence of Stereotypes**

13.　Women remain, disturbingly, effectively segregated in college athletics.

14.　Statistics show that 75% of athletic directors are male, 97% of men's teams are coached exclusively by men, and men serve as head coaches of 55% of women's teams.[1]

15.　At SUNY–Stony Brook, men are exclusively recruited and hired to coach men's teams: 100% of head and assistant coaches of men's teams are male.

16.　Men also have disproportionate access to coaching women's teams at SUNY–Stony Brook: 56% of head coaches and 71% of assistant coaches of women's teams are male.

17.　Conversely, women serve as head coach of only 44% percent of women's teams, and a mere 29% of assistant coaches of women's teams are female.

18.　The gender segregation in college athletics is "separate but equal," but rather a one-way segregation that gives men exclusive, complete access to coaching men and disproportionate access to coaching women.[2]

---

[1] As of 2014, the data showed that 57.1% of women's teams are coached by males and 97% of men's teams are coached by males. 77.7% of athletic directors are male. Acosta and Carpenter, Women in Intercollegiate Sport (2014).

[2] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, Against Women's Sports, Washington University Law Review, Vol 95:1 (2018).

19.     Regardless of physical differences between male and female athletes, there is no reason (other than gender stereotypes) for a university to exclusively recruit and hire men to coach men while permitting men to also hold coaching positions on women's teams.[3]

20.     Continued, one-way segregation of women is strong evidence of gender stereotypes within each university and, if not addressed, will continue to exacerbate existing gender stereotypes that harm women like Coach Atkinson.[4] It is prohibited by Title IX. *See* 34 C.F.R. § 106.51(a).

**Title IX: Imbalances as Evidence of Gender Stereotypes and Interrelation with Title VII**

21.     Per its EADA report, SUNY at Stony Brook is out of compliance with Title IX. In 2017, at Stony Brook there was a 8% participation gap, meaning that in order to maintain the number of male athletes Stony Brook had in 2017, the university would have needed to add 86 meaningful athletic participation opportunities for women to be in compliance with Title IX under prong one of the participation test. In 2018, that gap was still 7.1%, meaning the University needed to add 80 meaningful athletic participation opportunities for women.

22.     The purpose of Title IX was to address the long-standing negative consequences from gender stereotypes—how society traditionally expects women to behave in athletics.

---

[3] "Based on our results and other findings (e.g., Berri et al. 2009) that have examined the impact of head coaches on teams' and players' performances, it appears that both men and women are readily equipped for success in the coaching profession (and in some cases, women coaches have been more successful than the male coaches they replace; Aicher and Sagas 2010). As such, our results imply that the absence of women coaches for men's teams is not grounded in any objective or reliable evidence." Darvin, L., Pegoraro, A., & Berri, D., Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball, Sex Roles, 78:455–66 (2018).

[4] "Cunningham and Sagas (2008) found not only that women have less access to positions as head coaches, but also that when women are able to obtain these positions, they are not treated with the same level of respect that their male colleagues are afforded. Processes such as these reinforce the subconscious formation of leadership stereotypes and serve to perpetuate sport as a gendered space. These stereotypes often exist despite a lack of evidence and objective measurements of coaching performance." Id.

4

23.     The failure to comply with Title IX contributes to athlete dissatisfaction and is further evidence that gender stereotypes existed, and continue to exist, at SUNY–Stony Brook.

24.     Title VII forbids discrimination because of sex against any individual in hiring or "with respect to [their] compensation, terms, conditions, and privileges of employment . . . ." 42 U.S.C. § 2000e2(a)(1). Title VII also makes it an unlawful practice for an employer "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect [their] status as an employee . . . ." 42 U.S.C. § 2000e2(a)(2).

25.     Title IX prohibits sex discrimination in educational programs and activities receiving federal financial assistance, and also applies to a claim of sex discrimination in employment.

26.     Title IX applies to the employment of coaches, administrators, and academics and states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681.

27.     Title IX regulations specific to employees were promulgated by congress. See 34 C.F.R. part 106, Subpart E. *See also N. Haven Bd of Educ. v. bell*, 456 U.S. 512, 512 (1982) (noting that "subpart E regulations promulgated in connection with title IX are valid.").

28.     The U.S. Department of Education also adopted guidance interpreting Title ix to cover and protect employees of educational institutions. *See* Title IX Resource Guide, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

29.     Title IX's legislative history makes clear that Title IX's gender discrimination prohibition applies to the employment of coaches, administrators, and academics. See Simpson,

Lynda Guild, Sex Discrimination in Employment under Title IX, U. Chi. L. Rev. Vol. 48: Issue 2, Article 8.[5] *See also* 14 C.F.R. § 1253.500(a) and 34 C.F.R. § 106.51(a) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient that receives Federal financial assistance.").

30.     Title IX regulations make clear that Title IX's gender discrimination prohibition applies to Defendant's employment decisions including, but not limited to, decisions regarding hiring, promotion, consideration for and award of tenure, demotion, rates of pay or any other form of compensation, and changes in compensation. 14 C.F.R. § 1253.500(b)(1)–(10), 34 C.F.R. § 106.51(b)(1)–(10).

31.     Courts have held that subjecting an individual to sex stereotyping constitutes sex discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989). The Supreme Court explained: In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be, for example, aggressive, has acted on the basis of gender.[6]

32.     Sex stereotyping also violates Title IX's prohibition of discrimination on the basis of sex. (U.S. Depart. of Justice – Title IX Legal Manual).

### JURISDICTION AND VENUE

33.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 42 U.S.C. § 2000e-5(f)(3).

---

[5] Available at: https://chicagounbound.uchicago.edu/uclrev/vol48/iss2/8.
[6] Gender stereotyping has been fully recognized in the Second Circuit: *Back v. Hastings on Hudson Union free Sch. Dist.*, 354 F.3d 107 (2d 2004) (recognizing sex stereotyping and applying *Price Waterhouse*).

34.     Venue exists in this Court, as the events giving rise to this lawsuit occurred in Stony Brook, Suffolk County, New York.

35.     Coach Atkinson's discrimination charge against Defendant was dual filed on November 19, 2018, with the New York State Division of Human Rights and the Equal Employment Opportunity Commission.

36.     The charge alleged, *inter alia*, that Defendant discriminated against her and terminated her employment due to her gender and race.

37.     The EEOC issued a Notice of Right to Sue dated August 23, 2019. This action is being brought within 90 days from the issuance of the Notice of Right to Sue. (Exhibit 1)

**PARTIES**

38.     Plaintiff, a black woman of Jamaican descent, is a resident of Rocky Point, New York.

39.     Coach Atkinson is a former employee of Defendant.

40.     Defendant, SUNY, is a system of public institutions of higher education in New York.

41.     Plaintiff was employed by SUNY and worked at SUNY's Stony Brook campus in Suffolk County, New York.

**STATEMENT OF FACTS**

**Initial Background**

42.     Janelle Atkinson is an internationally recognized Jamaican-born swimmer.

43.     Atkinson was the 1999–2000 National High School Swimmer of the Year, which made her the most recruited U.S. high school swimmer her senior year in Jacksonville, Florida.

44.     At the age of 17, Atkinson swam for Jamaica at the 1999 Pan American Games in Winnipeg Manitoba. Atkinson became a three-time silver medalist, finishing third in each of the 200-, 400- and 800-metre freestyle events before graduating high school.

45.     Atkinson is a two-time Olympic swimmer.

46.     Atkinson represented Jamaica for the first time her summer after graduating high school at the 2000 Summer Olympics in Sydney, Australia, where she finished fourth in the 400-metre freestyle and ninth in the 800-metre freestyle.

47.     Atkinson represented Jamaica at the 2004 Summer Olympics in Athens, Greece, where she competed in the 200-metre freestyle and 400-metre freestyle.

48.      Atkinson was recruited by the University of Florida and swam for the Gator's Division I swimming and diving team from 2001-2004.

49.     In college, Atkinson had three top-three finishes in three years of NCAA Championships.

50.     Atkinson also won three Southeastern Conference (SEC) Championships (twice in the 500-yard freestyle and once in the 1,650-yard freestyle) and received three First Team All-Southeastern Conference accolades.

51.     Atkinson received ten All-America honors before graduating from Florida with a bachelor's degree in tourism and hospitality management in 2005.

52.     In addition to her NCAA Division I swim career at the University of Florida, Atkinson also swam internationally for Team Jamaica.

53.     Atkinson won two bronze medals at the 2002 Commonwealth Games held in Manchester, England (in the 400-metre freestyle and 800-metre freestyle).

54.     Atkinson was named Jamaica's Swimmer of the Year seven consecutive times from 1997 to 2003.

55.     After retiring from competitive swimming, Atkinson maintained her passion for her sport by working to help others learn and understand the sport.

56.     In 2006, Atkinson was hired as the assistant swimming coach at Wright State University in Dayton, Ohio—a NCAA Division I program.

57.     In 2010, Atkinson was hired as the assistant swimming coach for the University of Connecticut Huskies women's NCAA Division I swimming and diving team in Storrs, Connecticut.

58.     In 2013 and 2016, USA Swimming hired Atkinson to be the Head Coach for their Southern Zone Diversity Select Camp.

59.     In 2014, Atkinson became the head coach of Swimming and Diving at Fairfield University in Fairfield, Connecticut.

60.     Atkinson also has competitive international coaching experience.

61.     Atkinson was hired by Jamaica to be the head coach of the Jamaican women's national team at the 2009 World Aquatics Championships.

62.     During the 2012 London Olympic Games, Atkinson participated as a sports analyst for SportsMax TV.

63.     During the 2016 Rio de Janeiro Olympic Games, Atkinson participated as a televised sports analyst and commentator on ESPN.

64.     Defendant employed Coach Atkinson as the head swimming and coach beginning in March 2017.

65.     Prior to that, she had served as a college swimming coach for more than a decade.

66. Defendant hired Ms. Atkinson to rebuild its swimming program after the program had been suspended for 5 years while the university's swimming pool underwent extensive renovations.

67. The usual protocol for starting a program from scratch is to give the coach a full year to recruit a team.

68. This would have given Ms. Atkinson until September 2018 to recruit a full roster of swimmers ready and able to compete at the Division I level.

69. However, Defendant was eager to get the program up and running in time for the 2017–18 season, which began in the fall of 2017, because SUNY would receive additional funding from the NCAA and the addition of a women's team would help reduce the degree to which SUNY was out of compliance with Title IX.

70. NCAA standards call for a minimum of 11 swimmers on a team.

71. Ms. Atkinson worked diligently between March and September 2017, and she was able to secure 13 recruits.

72. Right before the 2017–18 academic year, one of those recruits was deemed academically ineligible to swim.

73. A second recruit decided she no longer wanted to attend SUNY.

74. Two more young women joined the team to bring the roster back to 13.

75. One swimmer quit after the team's first practice and another quit shortly after once she realized the level of commitment required to swim at the Division I level.

76. Another swimmer quit after learning she would be academically ineligible until January 2018.

77.     Many of the remaining swimmers were not the caliber of athlete that Coach Atkinson would have recruited had she been given sufficient time to put together a competitive roster for an NCAA Division I team.

78.     Many of the remaining swimmers were not prepared for the level of commitment required of competition at the Division I level.

79.     As a result, as the season progressed, several more student athletes left the team due to the time commitment. At least one of the student athletes who quit had pre-existing mental health concerns.

80.     Throughout her tenure at SUNY, Coach Atkinson was repeatedly told by Athletic Director Shawn Heilbron that SUNY understood Coach Atkinson would need time to build the program; that most of the current roster of swimmers were not of the caliber necessary to make the program competitive; and that Coach Atkinson would not be held to high performance standards for at least the first 3–5 years while she built the program from scratch.

**Lack of Institutional Support**

81.     Throughout her tenure, SUNY administrators failed to give Coach Atkinson the same degree of respect and control over her team as they did male coaches and/or white coaches.

82.     Throughout her tenure, Coach Atkinson was the only black, female coach at Stony Brook.

83.     AD Heilbron told Coach Atkinson that it was common for coaches, regardless of gender, to get student-athlete complaints about their respective athletic programs.

84.     SUNY employs several male coaches that have been coaching over several years that have been complained about by their student athletes.[7]

---

[7] For example, men's baseball coach Matt Senk (white, male) has been coaching for 30 years at SUNY; men's/women's cross country coach Andy Ronan (white, male) has been coaching at SUNY for 10

85.     Given that it is typical for student athletes to complain about their coaches, it is likely that these long-term male coaches have received student-athlete complaints yet were not investigated (without an opportunity to rebut the complaints) and summarily terminated—in stark contrast to Coach Atkinson.

86.     Given the tenure of this group of long-term male coaches, each was permitted to coach their athletes, manage their programs, dismiss athletes if necessary and yet were asked by SUNY to renew contracts repeatedly over several years regardless of whether they received student-athlete complaints.

87.     In contrast, Coach Atkinson was pushed out mid-season due to student-athlete complaints she was not privy to. Accordingly, Coach Atkinson was not given the same opportunity as white, males to coach her athletes, manage her program, dismiss athletes if necessary etc.

88.     In approximately November 2017, Coach Atkinson had a meeting with Student Athlete A, who Coach Atkinson was considering cutting from the team because Student Athlete A was not keeping up with practices and was not performing at a high enough level to be competitive.

89.     During the meeting, Student Athlete A informed Coach Atkinson that she needed to return home for a funeral and specified the practices she would miss.

90.     Student Athlete A missed two additional practices without informing Coach Atkinson of her intention to be absent.

---

years; men's football coach Chuck Priore (white, male) has been coaching at SUNY for 14 years; men's lacrosse coach Jim Nagle (white, male) has been coaching at SUNY for 7 years; men's soccer coach Ryan Anatol (male of color) has been coaching for 9 years at SUNY; men's track and field coach Andy Ronan (white, male) has been coaching at SUNY for 20 years; men's basketball coach Jeff Boals (white, male) has been coaching for 4 years; women's lacrosse coach Joe Spallina (white, male) has been coaching at SUNY for 8 years; women's tennis coach Gary Glassman (white, male) has been coaching at SUNY for 21 years.

91.     Coach Atkinson pulled Student Athlete A aside and explained that her lack of communication was not acceptable. She explained that Student Athlete A's overall lack of communication and absences from many practices suggested that she was not prepared for the rigors of a Division I program. Coach Atkinson suggested that a club team might be better suited to Student Athlete A's commitment and skill level.

92.     Student Athlete A told Coach Atkinson she would think on it and left the meeting.

93.     The following day, Associate Athletic Director Stephen Clacherty pulled Coach Atkinson into a meeting with himself and Student Athlete A.

94.     At that meeting, Coach Atkinson learned that Student Athlete A had left the previous day's meeting and told AAD Clacherty that Coach Atkinson had kicked her off the team.

95.     Coach Atkinson explained that Student Athlete A had not been kicked off the team; rather, she had suggested that a club team may be more appropriate.

96.     Student Athlete A informed Coach Atkinson and AAD Clacherty that she did not want to compete with a club team, but wanted to remain on the varsity team.

97.     Coach Atkinson told Student Athlete A that she could remain on the team and that she would be entered into the upcoming meet if Student Athlete A practiced with the club team and kept in communication. AAD Clacherty was present throughout this meeting.

98.     Some of the club team's practices were cancelled and Student Athlete A failed to make up for the cancelled practices.

99.     The day before the meet, she failed to show up for a practice scheduled by Coach Atkinson and did not communicate with Coach Atkinson about the absence.

100.     Because Student Athlete A had hardly swum at all in the last month (and competing while out of shape posed a significant safety risk), and had again failed to communicate, Coach Atkinson did not enter Student Athlete A into the meet.

101.     When Student Athlete A arrived at the meet, after not having been in contact at all with Coach Atkinson, she was upset to learn that she had not been entered into the meet.

102.     Student Athlete A walked away and then returned and handed her phone to Coach Atkinson.

103.     AAD Clacherty was on the phone and started screaming at Coach Atkinson for not entering Student Athlete A into the meet.

104.     Coach Atkinson remained calm and explained why the swimmer had not been entered.

105.     AAD Clacherty continued yelling at Coach Atkinson, even after she acquiesced and agreed to enter Student Athlete A into the meet.

106.     The following Monday, AAD Clacherty texted Coach Atkinson requesting a meeting to continue their "conversation" from the previous Friday (the day of the meet).

107.     Still shaken from AAD Clacherty's aggressive behavior toward her on Friday, Coach Atkinson requested to have someone else present at the meeting.

108.     AAD Clacherty repeated resisted having someone else present.

109.     Eventually, AAD Clacherty relented and a meeting was held with Coach Atkinson, AAD Clacherty, AD Heilbron, and Assistant Coach Jordan Bowen.

110.     AAD Clacherty's behavior toward Coach Atkinson was markedly different, and more appropriate, during this meeting.

111.    During the meeting, AD Heilbron asked what Coach Atkinson needed to help improve team morale and build the program.

112.    Coach Atkinson explained that she had tried numerous things already (team meetings with sports psychologists, team building exercises, motivational exercises, etc…) and asked if they had any other suggestions.

113.    She was told they did not have any other suggestions, that she had done all she could do, and that she just needed to get through the year until she recruit higher-level swimmers.

114.    Coach Atkinson asked AD Heilbron to meet with the team so the team understood that administration supported her and they understood that Coach Atkinson was not the only one who expected them to attend practices, communicate, push themselves to perform at their highest level, etc…

115.    AD Heilbron declined to do this and instead had members of the women's lacrosse team meet with the team.

116.    Following that meeting, the lacrosse members informed AD Heilbron that they felt bad for the swim team coaches because the swimmers did not appreciate the rigors of Division I competition.

117.    Coach Atkinson was not given the same institutional support as male coaches and coaches of men's teams including but not limited to: men's baseball coach Matt Senk (white, male) has been coaching for 30 years at SUNY; men's/women's cross country coach Andy Ronan (white, male) has been coaching at SUNY for 10 years; men's football coach Chuck Priore (white, male) has been coaching at SUNY for 14 years; men's lacrosse coach Jim Nagle (white, male) has been coaching at SUNY for 7 years; men's soccer coach Ryan Anatol (male of color) has been coaching for 9 years at SUNY; men's track and field coach Andy Ronan (white, male) has been coaching at

SUNY for 20 years; men's basketball coach Jeff Boals (white, male) has been coaching for 4 years; women's lacrosse coach Joe Spallina (white, male) has been coaching at SUNY for 8 years; women's tennis coach Gary Glassman (white, male) has been coaching at SUNY for 21 years..

118. To Coach Atkinson's knowledge, male and/or white coaches were permitted to make their own decisions about who to play in a competition and who should be cut from a team yet Coach Atkinson was prohibited from making these typical coaching decisions.

119. Coach Atkinson is aware of male and/or white coaches who received complaints from student athletes who were upset about the amount of their playing time.

120. AD Heilbron told Coach Atkinson these complaints were common and that administration did not get involved in those decisions, as they were up to the coach.

121.

Meanwhile, Coach Atkinson was micromanaged in administration of her team in ways male and/or white coaches and coaches of men's teams were not.

**Student-Athlete Complaints**

122. In December 2017, Student Athlete A was still not progressing, and Coach Atkinson proposed to AAD Clacherty that Defendant implement a standard requiring an athlete to be in the top 80% in the conference standing in order to be entered into a meet.

123. AAD Clacherty agreed, given that it was not financially efficient to take an athlete to a meet if the athlete would not be competitive. He suggested Coach Atkinson meet with Student Athlete A to explain the standard and expectations.

124. Coach Atkinson and Assistant Coach Bowen met with Student Athlete A and also asked Student Athlete A to send them an e-mail summarizing the conversation to ensure Student

Athlete A understood the expectations. Student Athlete A did send the email accurately summarizing the expectations.

125.     In early January 2018, Student Athlete A had a phone conference with AD Heilbron and AAD Clacherty and informed them that she was quitting the team.

126.     AAD Heilbron and AAD Clacherty asked Student Athlete A if there was any specific reason she was quitting. Student Athlete A said there was not and ended the phone call.

127.     The next day, Student Athlete A sent an e-mail to AD Heilbron, AAD Clacherty, SUNY President Samuel Stanley, the coaching staff, and others accusing Coach Atkinson of abusive behavior, ignoring or downplaying the mental health concerns of student athletes, and ignoring or downplaying student-athlete injuries.

128.     Coach Atkinson called AD Heilbron, who told her that they would conduct an investigation and asked her to compile documentation so he could provide it to President Stanley. Coach Atkinson did this.

129.     On January 20, 2018, Coach Atkinson learned that the mother of Student Athlete B had sent an e-mail to administration accusing Coach Atkinson of abusive behavior.

130.     That same day, Coach Atkinson's volunteer coach informed her that he had been interviewed by the investigator.

131.     The volunteer coach informed Coach Atkinson that he had told the investigator what had actually happened, explained the difficulties coaching staff was having with Student Athlete A, Student Athlete B, and Student Athlete B's mother.

132.     The volunteer coach said the investigator seemed unwilling to listen to his explanation and then asked the volunteer coach to sign a statement that grossly mischaracterized his conversation with the investigator.

133.    Assistant Coach Bowen was supposed to be interviewed on January 26, 2018; however, that meeting was later abruptly cancelled.

134.    Instead, on January 26, 2018, AD Heilbron called Coach Atkinson in for a meeting and terminated Coach Atkinson's employment.

135.    Neither Coach Atkinson nor Assistant Coach Bowen were interviewed as part of the investigation.

136.    During the investigation, Coach Atkinson was never informed of the details of the allegations being made against her.

137.    All of the allegations against Coach Atkinson were demonstrably false in that administration

   a. Knew the allegations to be false based on their previous interactions with Student Athlete A, Student Athlete B, and Student Athlete B's mother; and/or

   b. Knew the allegations to be false because some of the allegations concerned alleged behavior was inconsistent with Coach Atkinson's behavior witnessed first-hand by administrators; and/or

   c. Coach Atkinson's documentation proved some of the allegations could not have been true; and/or

   d. A thorough and unbiased investigation would have revealed the remaining allegations to be false.

138.    SUNY failed to conduct a thorough and unbiased investigation.

139.    The allegations were the result of gender stereotypes affecting female coaches, and especially female coaches of color. SUNY would not have treated male or white coaches in the same way they treated Coach Atkinson.

140.    SUNY did investigate another white female coach for student athlete complaints; however, she was not terminated.

141. In particular, the allegations accused Coach Atkinson of abusive behavior even though Coach Atkinson's behavior was always well within acceptable and standard coaching behavior.

142. However, behavior that is acknowledged to be acceptable and standard for male coaches is often perceived as unacceptable for female coaches, especially female coaches of color.

143. AD Heilbron, AAD Clacherty, and others had attended many of the swim team's practices and could observe first-hand that Coach Atkinson's behavior was objectively acceptable and standard.

144. Coach Atkinson is aware of other (male and/or white) coaches who received student-athlete complaints and these coaches informed Coach Atkinson that administration had always supported them as coaches against these complaints.

145. SUNY's overreaction to the complaints, failure to properly investigate them, and insistence on giving them validity despite objective evidence to the contrary empowered the biased complaints.

146. The failure to properly investigate also evidences that gender and race was a contributing and/or motivating factor in the decision to terminate Coach Atkinson.

147. Coach Atkinson was replaced with a lesser qualified white female coach.

### COUNT I
### Gender Discrimination in Violation of Title VII

148. Coach Atkinson re-alleges all preceding paragraphs as if fully set forth herein.

149. Coach Atkinson has satisfied all conditions precedent for bringing suit under Title VII on these this claim.

150. Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex.

151. At all material times, Defendant was an "employer" within the meaning of Title VII.

152. Defendant's conduct was discriminatory against Coach Atkinson with respect to failing to treat her equally to male coaches, holding her to different and higher standards.

153. Defendant discriminated against Coach Atkinson on the basis of gender in violation of Title VII by holding her to a different standard than similarly-situated men in the terms and conditions of her employment including but not limited to:

    a. The oversight and management of her team,

    b. The institutional support provided to her;

    c. How she coached her players,

    d. In the evaluation of player complaints, and

    e. By firing her.

154. Upon information and belief, Defendant's failure to conduct a proper and unbiased investigation of the allegations made against Coach Atkinson is motivated, at least in part, by Coach Atkinson's sex. *Menaker v. Hofstra Univ.*, 935 F3d 20 (2d Cir 2019).

155. On information and belief, in discriminating against Coach Atkinson, Defendant acted with malice or in reckless disregard of Coach Atkinson's rights.

156. As a result of Defendant's conduct, Coach Atkinson suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

157. The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

    a. reinstatement of Plaintiff to her position as head coach, or front pay;

b. training for the coaches and staff of the athletic department on discrimination, with a special emphasis on race and gender;

c. training on race and gender bias for current and incoming student athletes and their parents; and

d. such other and further relief as the Court deems necessary to effectuate the purpose of Title VII.

**WHEREFORE**, Coach Atkinson requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

<u>**COUNT II**</u>
**Race Discrimination in Violation of Title VII**

158. Coach Atkinson re-alleges all preceding as if fully set forth herein.

159. Coach Atkinson has satisfied all conditions precedent for bringing suit under Title VII on this claim.

160. Under the provisions of both Title VII, it is unlawful for an employer to discriminate against an employee on the basis of race.

161. At all material times, Defendant was an "employer" within the meaning of Title VII.

162. Defendant's conduct was discriminatory against Coach Atkinson with respect to failing to treat her equally to white coaches, holding her to different and higher standards than white coaches.

163. Defendant discriminated against Coach Atkinson on the basis of race in violation of Title VII by holding her to a different standard than similarly situated white coaches in the terms and conditions of her employment including but not limited to:

    a. The oversight and management of her team,

    b. The institutional support provided to her;

    c. How she coached her players,

    d. In the evaluation of player complaints, and

    e. By firing her.

164. Upon information and belief, Defendant's failure to conduct a proper and unbiased investigation of the allegations made against Coach Atkinson is motivated, at least in part, by Coach Atkinson's race. *Menaker v Hofstra Univ.*, 935 F3d 20 (2d Cir 2019).

165. On information and belief, in discriminating against Coach Atkinson, Defendant acted with malice or in reckless disregard of Coach Atkinson's rights.

166. As a result of Defendant's conduct, Coach Atkinson suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

167. The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

    f. reinstatement of Plaintiff to her position as head coach, or front pay;

    g. training for the coaches and staff of the athletic department on discrimination, with a special emphasis on race and gender;

    h. training on race and gender bias for current and incoming student athletes and their parents; and

    i. such other and further relief as the Court deems necessary to effectuate the purpose of Title VII.

**WHEREFORE**, Coach Atkinson requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purpose of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

<u>**COUNT III**</u>
**Gender Discrimination in Violation of Title IX**

168.    Coach Atkinson re-alleges all preceding paragraphs as if fully set forth herein.

169.    Under the provisions of Title IX, it is unlawful for an employer to discriminate against an employee on the basis of sex.

170.    Defendant's educational programs and activities receive federal financial assistance within the meaning of Title IX.

171.    Coach Atkinson was denied the benefit of and subjected to discrimination in the Defendant's education programs and activities.

172.    Coach Atkinson's denial of benefits and subjection to discrimination were based on her sex and the sex of the athletes she coached.

173.    Title IX regulations require Defendant to take such remedial action as is necessary to overcome the effects of sex discrimination in violation of Title IX.

174.    Defendant violated Coach Atkinson's rights under Title IX by;

    a.    forcing Coach Atkinson to attempt to recruit an unrealistic number of Division I-capable athletes in a short time frame solely for the purpose of lessening the degree to which Defendant was out of Title IX compliance, and

     b.  punishing Coach Atkinson for the predictable, perhaps inevitable, results of recruiting last-minute athletes. Those predictable results were student-athlete complaints against Coach Atkinson.

175.    Defendant's actions in blaming Coach Atkinson under the circumstances reinforced the gender inequities by enabling baseless student-athlete complaints.

176.    As a proximate result of Defendant's actions, Coach Atkinson has in the past and will in the future suffer injuries and damages.

177.    On information and belief, in discriminating against Coach Atkinson, Defendant acted with malice or in reckless disregard of Coach Atkinson's rights.

178.    As a result of Defendant's conduct, Coach Atkinson suffered loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out of pocket expenses.

179.    The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

    a.  reinstatement of Plaintiff to her position as head coach, or front pay;

    b.  a court order requiring that the Defendant be audited regarding its compliance with Title IX and that any failures or violations of Title IX be immediately remedied by the university,

    c.  that Defendant be required to take steps to not only comply with Title IX, but to provide additional remedies and funding to make up for shortcomings and the failure to make progress as required by Title IX, and

    d.  such other and further relief as the Court deems necessary to effectuate the purpose of Title IX.

**WHEREFORE**, Coach Atkinson requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and

necessary to make Plaintiff whole and effectuate the purpose of Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## JURY DEMAND

**COMES NOW** the Plaintiff, Janelle Atkinson-Wignall, and hereby requests a trial by jury in the above-captioned matter.

_\_\_/s/ Thomas Newkirk\_\_\__
Thomas Newkirk
tnewkirk@newkirklaw.com
Beatriz Mate-Kodjo
Bmate-kodjo@newkirklaw.com
Danya Keller
dkeller@newkirklaw.com
NEWKIRK ZWAGERMAN, P.L.C.
521 East Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004

Carlo deOliveira
Phillip G. Steck
Cooper Erving & Savage LLP
steck@cooperirving.com
cdeoliveira@coopererving.com
39 N. Pearl Street
Albany, NY 12207
Ph: (518) 449-3900
Fax: (518) 432-3111

ATTORNEYS FOR PLAINTIFF


Original filed.