FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 3 1 2021 ★

LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
............................................................................X

JANELLE ATKINSON-WIGNALL,

          Plaintiff,

    -against-

STATE UNIVERSITY OF NEW YORK,

          Defendant.
............................................................................X

**MEMORANDUM OF**
**DECISION & ORDER**

19-CV-6527(GRB)(SIL)

**GARY R. BROWN, United States District Judge:**

Appearances:

Carlo deOliveira, Esq.; Phillip G. Steck, Esq.
Cooper Erving & Savage LLP
*Attorneys for Plaintiff*
39 North Pearl Street, 4th Floor
Albany, NY 12207

Danya Keller, Esq.; Thomas Andrew Newkirk, Esq.
Newkirk Zwagerman P.L.C.
*Attorneys for Plaintiff*
521 E Locust Street, Ste 300
Des Moines, IA 50309

Letitia James. Esq.
Attorney General of the State of New York
By: Helena Lynch, Esq., Richard H. Yorke, Esq.
*Attorneys for Defendant*
NYS Office of The Attorney General
Nassau Regional Office
200 Old Country Road, Suite 240
Mineola, NY 11501

      Plaintiff Janelle Atkinson-Wignall commenced this action against defendant State

University of New York at Stony Brook ("SUNY") pursuant to Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX"). Presently before the Court is defendant's motion to dismiss, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Plaintiff's Third Amended Complaint (hereinafter "Complaint" or "Compl."). For the reasons set forth below, the motion is DENIED.

## I. Background

### A. Factual Background

The facts are taken from the complaint which are assumed to be true only for the purposes of the instant motion. Plaintiff, a woman of Jamaican descent, was the Head Coach of the women's swimming team at SUNY from March of 2017 to January of 2018. Compl., Docket Entry ("DE") 36 at ¶¶ 64, 134. Prior to becoming a coach, Plaintiff was an accomplished swimmer in her own right, winning accolades at every scholastic level and eventually representing Jamaica on the international stage and competing in multiple Olympic games. *Id.* at ¶¶ 42-54. She also eventually coached the Jamaican Women's National swim team and coached at the collegiate level for more than ten years prior to her employment with SUNY. *Id.* at ¶¶ 56-61, 64.

When SUNY hired Plaintiff, the program had been dormant for five years and she was tasked with rebuilding the program. *Id.* at ¶ 66. Normally, when beginning a new program, a coach is given a full year to recruit a team. *Id.* at ¶ 67. Plaintiff's recruiting timeline was truncated because defendant was eager to add a new women's team to ease the degree to which the school was currently out of Title IX compliance. *Id.* at ¶ 69. Plaintiff was nonetheless able to recruit a full team by September 2017. *Id.* at ¶ 71. Due to the truncated timeline, however, Plaintiff was not able to recruit the caliber of athlete she would have had she been provided with sufficient time to recruit. *Id.* at ¶ 77. Several swimmers quit the team as they were not prepared for the rigors of NCAA Division I competition. *Id.* at ¶ 79. The Athletic Director repeatedly assured her that it

was understood that Coach Atkinson would need time to rebuild the program and "that most of the current roster of swimmers were not of the caliber necessary to make the program competitive; and that Coach Atkinson would not be held to high performance standards for at least the first 3–5 years while she built the program from scratch." *Id.* at ¶ 80. While at SUNY, Atkinson was the only black female coach the university employed. *Id.* at ¶ 82.

In November of 2017, Plaintiff began to have issues with a member of her team, Student Athlete A, who she was considering cutting from the team because of missed practices and substandard performance. *Id.* at ¶ 88. Plaintiff explained to Student Athlete A that her unexcused absences from practices were unacceptable and suggested joining a less rigorous club team. *Id.* at ¶ 91. Student Athlete A erroneously concluded that she had been kicked off the team, a misconception which Plaintiff rectified at a meeting with Student Athlete A and Associate Athletic Director Stephen Clacherty ("Clacherty") the following day. *Id.* at ¶¶ 93-96. Student Athlete A was permitted to remain on the team and compete in an upcoming meet, provided she practice with the club team and maintain contact with Plaintiff. *Id.* at ¶ 97. Student Athlete A failed to satisfy these conditions and was informed by Plaintiff at the meet that she would not be permitted to compete. *Id.* at ¶¶ 97-101.

Concerned, Student Athlete A contacted Clacherty by phone and then handed the phone to Plaintiff so she could speak to Clacherty directly. Clacherty proceeded to shout at Plaintiff and directed her to enter Student Athlete A into the meet, which Plaintiff did. *Id.* at ¶¶ 102-105. Plaintiff alleges that male and/or white coaches were permitted to make coaching decisions such as these, that the Athletic Director Heilbron ("Heilbron") told her that complaints over playing time were common, and that the administration did not get involved as such decisions remained within the discretion of the coach. *Id.* at ¶¶ 118-120.

The following week, Clacherty requested to meet with Plaintiff to continue their conversation. *Id.* at ¶ 107. Shaken by Clacherty's previous aggressive behavior, Plaintiff requested that a third party be present, a request repeatedly rebuffed but eventually accepted by Clacherty. *Id.* at ¶¶ 107-109. Plaintiff, Clacherty, Assistant Coach Jordan Bowen, and Heilbron then attended a meeting at which Clacherty's behavior was markedly more appropriate. *Id.* at ¶¶ 109, 110.

In December 2017, after Student Athlete A failed to improve, Plaintiff and Clacherty agreed that Plaintiff could implement a rule whereby only athletes in the top 80% of the conference standings would be entered into meets, a rule explained to Student Athlete A. *Id.* at ¶¶ 122-124. In early January 2018, Student Athlete A resigned from the team without providing Heilbron and Clacherty a reason for the resignation. *Id.* at ¶¶ 125, 126. The next day, Student Athlete A emailed Heilbron, Clacherty, SUNY President Samuel Stanley and the coaching staff accusing Plaintiff of "abusive behavior, ignoring or downplaying the mental health concerns of student athletes, and ignoring or downplaying student-athlete injuries." *Id.* at ¶ 127. Heilbron told Plaintiff that an investigation would be conducted, and that Plaintiff should compile documents to provide to President Stanley, which Plaintiff did. *Id.* at ¶ 128. Plaintiff then learned that the mother of another team member, Student Athlete B, had emailed the administration also accusing Plaintiff of abusive behavior. *Id.* at ¶ 129.

Plaintiff was also informed that her volunteer coach had been interviewed by the investigator. *Id.* at ¶ 130. According to the volunteer coach, he described the difficulties with Student Athletes A & B and B's mother, but relayed that the investigator "seemed unwilling to listen to his explanation and then asked the volunteer coach to sign a statement that grossly mischaracterized his conversation with the investigator." *Id.* at ¶¶ 131, 132. Neither Plaintiff nor

her paid Assistant Coach, Jordan Bowen, were interviewed by the investigator, and Plaintiff was never informed of the details of the allegations made against her. *Id.* at ¶¶ 135-36. Instead, Plaintiff was summoned to a meeting with Heilbron on January 26, 2018 at which she was terminated. Plaintiff's now-vacant position was filled by a white female coach.[1] *Id.* at ¶ 147.

Plaintiff filed discrimination charges premised on gender and race with the New York State Division of Human Rights and the Equal Opportunity Commission on November 19, 2018. *Id.* at ¶¶ 35, 36. The EEOC issued a Notice of Right to Sue on August 23, 2019. *Id.* at ¶ 37.

### B. Procedural Background

Plaintiff filed her initial complaint in November of 2019. DE 1. After Defendant filed a letter requesting a pre-motion conference in anticipation of a motion to dismiss, the parties consented to permit Plaintiff to file an amended complaint voluntarily dismissing her New York state law claim and curing some pleading deficiencies identified by the Defendant. *See* DE 15; DE 18. Plaintiff filed her First Amended Complaint on March 20, 2020, and the Court conducted a pre-motion conference regarding that complaint on March 25, 2020. *See* DE 18-3; DE 19. At the conclusion of the pre-motion conference the Court instructed Plaintiff to file a Second Amended Complaint consistent with the Court's ruling within ten days. DE 19. On April 6, 2020, Plaintiff filed a motion for leave to file a Second Amended Complaint with the consent of the Defendant, and the Court granted such leave to file on April 30, 2020. *See* Electronic Order dated April 30, 2020. On May 15, 2020, Plaintiff filed a motion for leave to file a Third Amended Complaint, which was opposed by the Defendant. *See* DE 28; DE 31. On June 25, 2020, Magistrate Judge Locke conducted a hearing and ultimately granted Plaintiff's motion for leave to

---

[1] On this motion, the parties submitted the credentials of the replacement coach, which appear substantial, and seemingly invited the Court to weigh the comparative merits of plaintiff and the replacement coach. Such determinations, though, are inappropriate at this juncture.

file the Third Amended Complaint.  DE 35.  The following day, Plaintiff filed the Third Amended Complaint, which is now the operative pleading in this case.  DE 36.

On August 4, 2020, the parties filed their fully briefed motions in support of and in opposition to Defendant's Motion to Dismiss the Third Amended Complaint.  DE 41; DE 42; DE 44; DE 45.  This opinion follows.

## II. Discussion

### A. Legal Standard

The pending motion to dismiss is decided under the well-established standard of review of motions made under Rule 12(b)(6), as discussed by way of example in *Burris v. Nassau County District Attorney*, 2017 WL 9485714, at *3-4 (E.D.N.Y. Jan. 12, 2017), *adopted by*, 2017 WL 1187709 (E.D.N.Y. Mar. 29, 2017), which discussion is incorporated by reference herein.  Under that standard, the Court is required to assume the allegations of the amended complaint to be true for the purposes of the motion.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

Claims premised on discrimination are not subject to any heightened pleading standard, but must meet the plausibility standard laid out in *Twombly* and *Iqbal*.  *See E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014) ("*Twombly*'s endorsement of *Swierkiewicz* mandates, at a minimum, that *Swierkiewicz*'s rejection of a heightened pleading standard in discrimination cases remains valid.").  However, "while a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive

6

a motion to dismiss…it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims…across the line from conceivable to plausible to proceed." *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014) (internal citations, alterations, and quotation marks omitted).

## B. Availability of a Private Right of Action Under Title IX

The principal legal question on this motion arises from the existence of a private right of action under Title IX.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a)).  The plain language of the statute does not provide for a private right of action and, as defendant properly notes, the Second Circuit has not yet ruled on the existence of an implied private right of action for employment discrimination under Title IX, resulting in differing opinions among  district courts in this Circuit.  *See Hauff v. State Univ. of New York*, 425 F. Supp. 3d 116, 129 (E.D.N.Y. 2019) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 131 (2d Cir. 2013)).

The Supreme Court, in this Court's view, has provided clear indication that such an implied right exists.  The Court turns to the well-reasoned decision of Judge Hurley on this issue, whose thoughtful analysis the undersigned fully endorses and adopts:

> In *Johnson v. Railway Express Agency Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), the Court held that the "remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct and independent." *Id.* at 461, 95 S.Ct. 1716. The Court reasoned that Title VII "manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable federal statutes," rejecting the argument that allowing the § 1981 claim to proceed might permit the plaintiff to circumvent Title VII's administrative requirements, going against Congress' intent. *Id.* at 459, 461, 95 S.Ct. 1716.

> In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court implied a private cause of action under Title IX for an applicant who sued a medical school alleging she was denied admission based on her sex. The Court reasoned that Title IX "explicitly confers a benefit on persons discriminated against" based

on sex and the plaintiff was "a member of that class for whose special benefit the statute was enacted. *Id.* at 694, 99 S.Ct. 1946. Later, in *Franklin v. Gwinnett County Public Schools*, the Court held that money damages were available for a student asserting a claim for sexual harassment under Title IX. 503 U.S. 60, 72-76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

The Court, in *North Haven Board of Education v. Bell*, 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982), rejected a challenge to agency promulgated regulations interpreting Title IX to extend to sex-based employment discrimination. It held that Title IX's prohibition of sex discrimination applies not only to students, but also to "[e]mployees who directly participate in federal programs or who directly benefit from federal grants, loans, or contract." *Id.* at 520, 102 S.Ct. 1912. In reaching that conclusion, the Court reviewed Title IX's legislative history and found employees of federally funded education programs and employment discrimination in academia an important focal point of Title IX. *Id.* at 523-30, 102 S.Ct. 1912. It also discussed how subsequent proposals in Congress to limit Title IX's coverage of employment discrimination have failed. *Id.* at 534-35, 102 S.Ct. 1912. Finally, the *North Haven* Court recognized that Congress had provided "a variety of remedies, at time overlapping, to eradicate" private sector employment discrimination. *Id.* at 535, 102 S.Ct. 1912.

Lastly, in *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005), a high school employee relieved of his coaching position after he complained that the girls' basketball team received unequal treatment on the basis of sex sued alleging a Title IX retaliation claim. The Court allowed the claim to proceed reasoning that if funding recipients were "permitted to retaliate freely," individuals who witness sex discrimination would be hesitant to report it and "all manner of Title IX violations might go unremedied." *Id.* at 180, 125 S.Ct. 1497. Although not explicitly addressed, the Court did not indicate that Title VII displaced relief under Title IX. Rather, it recognized that the two statute are "vastly different;" Title IX contains a "broadly written general prohibition on discrimination" whereas Title VII has "greater detail" as to "the conduct that constitutes discrimination." *Id.* at 175, 125 S.Ct. 1497.

*Hauff v. State Univ. of New York*, 425 F. Supp. 3d 116, 130-31 (E.D.N.Y. 2019). Based on that

survey of the law, Judge Hurley held:

This Court's analysis of the foregoing cases supports an implied cause of action under Title IX for employees of educational institutions receiving federal funding and that such a cause of action is not displaced by Title VII. First, as the *North Haven* Court found, the legislative history supports that Title IX extends to employment discrimination in educational institutions. 456 U.S. at 523-30, 102 S.Ct. 1912. Indeed, in the Senate, Title IX was introduced as "targeting "admission procedures, scholarships, and faculty employment." 118 Cong. Rec. 5803 (1972). Similarly, in the House it was proposed to combat, in addition to disparities in student admission standards, "at the faculty level, sex differences in rank and salary at colleges and universities." H. R. Rep. No. 92-554 (1972). Moreover, the Supreme Court's analysis in *Cannon* was not explicitly limited to students as it held that is was inferring a private remedy in favor of "individual persons," 441 U.S. at 691, 99 S.Ct.

1946, which term the *North Haven* Court later defined to include both students and employees, 456 U.S. at 520-21, 102 S.Ct. 1912. Finally, the recognition in *Johnson* that Title VII "manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable federal statutes, coupled with the reasoning in *Jackson* that Title IX and Title VII are vastly different statutes, further supports the availability of Title IX for employment discrimination claims by employees of educational institutions.

*Id.* at 131-32. And while it remains true that the Second Circuit has not spoken directly to this issue, the Circuit's decision in the *North Haven* case, later reviewed by the Supreme Court, strongly suggests that Title IX encompasses employment discrimination in a manner that is not undermined by Title VII. *N. Haven Bd. of Ed. v. Hufstedler*, 629 F.2d 773, 784 (2d Cir. 1980) ("Nor is it particularly noteworthy that employment discrimination in educational institutions is now prohibited by Title VII and the Equal Pay Act [as o]verlapping jurisdiction in the area of employment discrimination is well recognized."), *aff'd and remanded sub nom. N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512 (1982).

Accordingly, this Court agrees with Judge Hurley's analysis suggesting that a private plaintiff may bring claims of employment discrimination under Title IX. This determination renders the balance of defendant's motion easily dispatched.

### C. Sufficiency of Plaintiff's Allegations

"Title IX claims are analyzed under the same framework as claims arising under Title VII of the Civil Rights Act of 1964." *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 153 (S.D.N.Y. 2004) (citing *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243, 248 (2d Cir. 1995)).

The Second Circuit has clarified the showing required of a plaintiff to meet his or her initial burden under Title VII in the context of a motion to dismiss:

The question we face is what, in the Title VII context, must be plausibly supported by factual allegations when the plaintiff does not have direct evidence of discriminatory intent at the outset. Answering this question requires attention to the shifting content of the prima facie requirements in a Title VII employment discrimination suit. Recapitulating what we have spelled out above, while the plaintiff ultimately will need evidence sufficient to prove discriminatory motivation on the part of the employer-defendant, at the initial stage of the litigation—prior to the employer's coming forward with the claimed reason for its action— the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, *and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation*, then she has satisfied the prima facie requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action. *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089; *St. Mary's Honor Ctr.*, 509 U.S. at 506–07, 113 S.Ct. 2742. [ ]

In other words, absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent. The facts alleged must give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation. The facts required by *Iqbal* to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination. They need only give plausible support to a minimal inference of discriminatory motivation.

*Littlejohn v. City of New York*, 795 F.3d 297, 310–11 (2d Cir. 2015) (emphasis added); *see also*

*Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) ("The burden-shifting framework thus

reduces the facts needed to be pleaded under *Iqbal* at the 12(b)(6) stage of a Title VII suit." (internal

quotation omitted)).

Here, the only remaining disputed question is whether the allegations provide at least

minimal support for an inference of discriminatory intent.  To allege the requisite discriminatory

intent, a plaintiff may allege "facts that directly show discrimination or facts that indirectly show

discrimination by giving rise to a plausible inference of discrimination."  *Levy v. Legal Aid Soc'y*,

408 F. Supp. 3d 209, 214 (E.D.N.Y. 2019) (quoting *Vega v. Hempstead Union Free Sch. Dist.*,

801 F.3d 72, 87 (2d Cir. 2015)).  "Direct evidence of discrimination may exist, for example, in the

form of disparaging comments regarding a plaintiff's protected class." *Id.* "Indirect evidence, on the other hand, includes evidence that similarly situated comparators outside of Plaintiff's protected class were treated more favorably than Plaintiff." *Id.* (citing *Littlejohn*, 795 F.3d at 312).

Plaintiff's allegations fall into four categories: (1) other white and/or male coaches who were not terminated after receiving student athlete complaints; (2) impermissible gender stereotyping; (3) irregularities with the investigation procedures employed by the University; and (4) her replacement by a lesser qualified white female coach. *See, e.g.*, Compl., DE 36 at ¶¶ 84, 119, 120, 140, 144, footnote 7, 147. Such allegations have been found to suffice in defeating a motion to dismiss. *Littlejohn*, 795 F.3d at 311 (A plaintiff's complaint survives a motion to dismiss "[i]f she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a minimal burden of showing facts suggesting an inference of discriminatory motivation.")

According to the Second Circuit, "an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312-13. And further, "[t]he fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis, including at the pleading stage." *Id.* at 313 (citation omitted). While the plaintiff in *Littlejohn* also alleged that the employee who replaced her was less qualified, the Second Circuit found that these allegations were "*more than* sufficient to make plausible her claim that her demotion occurred under circumstances giving rise to an inference of discrimination." *Id.* (citation omitted) (emphasis added). Based on the more general language quoted above and the explicit statement from the Second Circuit that the allegations in

*Littlejohn* were more than sufficient, a plaintiff can meet her burden of raising a minimal inference

of discrimination by alleging that she was replaced with someone outside of her protected class.

Marshalling her allegations, plaintiff asserts:

Given that it is typical for student athletes to complain about their coaches, it is likely that these long-term male coaches have received student-athlete complaints yet were not investigated (without an opportunity to rebut the complaints) and summarily terminated— in stark contrast to Coach Atkinson.

Given the tenure of this group of long-term male coaches, each was permitted to coach their athletes, manage their programs, dismiss athletes if necessary and yet were asked by SUNY to renew contracts repeatedly over several years regardless of whether they received student-athlete complaints.

In contrast, Coach Atkinson was pushed out mid-season due to student-athlete complaints she was not privy to. Accordingly, Coach Atkinson was not given the same opportunity as white, males to coach her athletes, manage her program, dismiss athletes if necessary etc.

Compl., DE 36 at ¶¶ 85-87.  Taken together, these allegations provide a sufficient factual nexus

from which an inference of discrimination could well arise, and there is sufficient – though not

overwhelming – detail provided to support these assertions.  *Roache v. Long Island R.R.*, 487 F.

Supp. 3d 154, 172 (E.D.N.Y. 2020) ("[p]laintiff plausibly contends that he was demoted and was

denied opportunities to work overtime afforded … to similarly situated … colleagues. Such

allegations, albeit suffering from a lack of specificity, thus placing them on the razor's edge of

plausibility, are sufficient to create an inference of discrimination."); *Levy v. Legal Aid Soc'y*, 408

F. Supp. 3d 209, 213–14 (E.D.N.Y. 2019) (internal quotations omitted) (alteration in original)

(denying motion to dismiss where plaintiff alleged that other employees were not terminated for

engaging in the same type of conduct, declining to delve into a comparative inquiry of the relative

severity of the violations, and stating "[w]hile at some later stage in this proceeding, a jury may

consider the qualitative differences between Plaintiff's emails and those of his comparators, at this

stage, although not identical, the respective conduct bears a sufficiently close resemblance to

defeat a motion to dismiss." (citing *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 230 (2d Cir. 2014))).

Based on the foregoing, the Court finds that Plaintiff has met her burden of alleging facts sufficient to support a plausible inference that gender and race-based discrimination led to her termination. Therefore, Defendant's motion to dismiss her claims for discrimination under Title VII and Title IX is DENIED.

## III. CONCLUSION

Based on the foregoing, Defendant's motion to dismiss is DENIED in its entirety.

**SO ORDERED.**

Dated: Central Islip, New York
      April 6, 2021

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge
